# EXHIBIT A

# (Redacted)

## SALES REPRESENTATIVE AGREEMENT

THIS SALES REPRESENTATIVE AGREEMENT dated as of October 31, 2018 between Scholle IPN Packaging Inc., organized under the laws of Nevada, having offices at 200 West North Ave., Northlake, IL 60164 (the "Company") and Zephyr Fluid Solutions, LLC, a company organized under the laws of Connecticut, having offices at 30 Pecks Lane, Newtown, CT 06470 (the "Representative"), collectively, the "parties."

In consideration of the covenants, conditions and mutual agreements hereinafter set forth, the parties agree as follows:

1. Appointment of Representative

1.1   The Company hereby appoints Representative as its exclusive sales representative to promote and solicit sales of the Company's products listed in Exhibit A hereto (the "Products") to the Customers set forth in Exhibit A (the "Territory" or "Customers"). Representative accepts the appointment and agrees to act as the Company's Representative in the Territory, subject to the terms and conditions of this Agreement.

1.2   It is understood that this Agreement does not appoint Representative as an agent or other legal representative of the Company, and that Representative is acting on its own account and has no power or authority to assume, create, or incur any liability or obligation of any kind, express or implied, against or in the name of, or on behalf of, the Company in any transaction with a third party. Additionally, Representative shall be an independent contractor and not an employee Company.

2. Representative's Obligations

2.1   Representative agrees to use its best efforts (i) to promote and solicit sales of the Products in the Territory diligently and in good faith in a manner calculated to maximize sales of the Products in the Territory and (ii) to maintain continuous service and customer assistance, including after-sales support and technical services, for the Company's customers in the Territory. Representative agrees not to solicit sales of the Products outside the Territory, refraining in particular from sales promotion, publicity, establishment of branches or affiliates and appointment of sub-representatives outside the Territory for the purpose of soliciting sales of the Products. Additionally, Representative shall only market the Products for use in water applications. Company will have no obligation to pay any commissions for sales of Products for uses outside of water applications. New Customers may be added to the Territory pursuant to a mutually agreed written amendment to Exhibit A.

2.2  The Representative shall make no representation, guarantee or warranty, either express or implied, with respect to the Products beyond those contained in material distributed by the Company. Representative shall solicit orders for the Products in accordance with Company's pricing and terms and conditions. Initial pricing is set forth in Exhibit B.

2.3  The Representative acknowledges that this Agreement creates a relationship of confidence and trust between the Representative and the Company with respect to any information of a confidential or secret nature applicable to the business of the Company and the Representative, including any information applicable to processes, trade secrets, improvements, techniques, inventions and know-how (collectively called "Proprietary Information"). Accordingly, the Company and the Representative agree at all times during the term of this Agreement and thereafter to hold in trust and confidence and to refrain from using or disclosing any Proprietary Information except when acting in the interest of the Company and the Representative pursuant to this Agreement, and only then with the prior written consent of the Company or the Representative, respectively.

2.4  The Representative agrees that it will not represent in the Territory a product which is competitive with the Products without the prior written consent of the Company.

2.5  The Representative shall not remove or cover up any labels or markings placed by the Company on the Products and shall insert in all advertising and promotional material a statement that the Products are manufactured by the Company.

2.6  Representative shall supply the Company with advance copies of all sales literature proposed to be distributed with respect to the Products, and distribution or other use thereof shall be subject to the prior written approval of the Company. If such sales literature is written in a language other than English, it shall be accompanied by an English translation. Except as provided in Section 3.2 of this Agreement, all selling costs incurred in connection with the promotion, solicitation, sale and service of the Products shall be borne entirely by Representative.

2.7  Without the prior written approval of the Company, Representative shall not appoint or otherwise deal with any sub-representatives or agents in connection with the promotion and solicitation of sales of the Products in the Territory. Representative shall keep the Company informed of the activities of any approved sub-representative or agents and shall be primarily responsible to the Company for the compliance by such sub-representatives and agents with the terms and conditions of this Agreement.

2.8  In connection with its duties under this Agreement, both Company and Representative shall comply with all applicable laws of the United States and the countries comprising the Territory and shall do nothing to cause the other party to be in

violation of such laws, including, without limitation, the U.S. Export Administration Act, the U.S. Foreign Corrupt Practices Act and the regulations thereunder. Either party may request information or certificates from the other party in connection with compliance with any such laws.

2.9     Regarding its duties under this Agreement, Representative shall be solely responsible for the payment of all costs and expenses incurred by the Representative, including but not limited to, salaries, benefits, per diem, overhead expenses, and taxes.

2.10    Representative agrees to provide Company with monthly status updates regarding sales and marketing initiatives with the Customers.

3.      The Company's Obligations

3.1     The Company shall refer to Representative inquiries received by the Company for sale of the Products in the Territory.

3.2     The Company agrees to make available to Representative without charge, in such quantities as Representative may reasonably require, catalogs, samples, sales literature or other material used to promote the Products.

3.3     The Company shall provide Representative with current information as to improvements, upgrades, or other changes in the Products, and prepare samples for potential Customers as reasonably requested by Representative, but only if Representative has given Company sufficient notice of its request.

3.4     The Company agrees to work collaboratively with Representative and that it shall inform and provide Representative with information received, including any orders or related requests sent directly from Customers to Company regarding the purchase of Products.

3.5     The Company may work directly with the Customers with Representative's knowledge. However, the Company shall not sell or lease Products to Customers without providing the commissions set forth in this Agreement.

4.      Compensation

4.1     For services rendered hereunder, the Company agrees to pay the Representative the commissions set forth on Exhibit B on Net Sales of Products sold or leased to Customers.  "Net Sales" shall mean Company's gross invoice price to Customer for Products, excluding shipping costs, sales, use, value-added or similar taxes.

4.2     Notwithstanding any other provision of this Agreement to the contrary, no commission will be payable with respect to:

    (a) any order with respect to which payment of a commission would violate the terms of the order or the laws of the United States or the country in which the Customer is located;

    (b) orders issued to the Company for the purpose of repairing or replacing Products damaged in transit or for warranty repairs; or

    (d) Products which have been returned to the Company for refund or credit. In such an event, and if commissions have already been paid to the Representative, the Company shall be entitled to recoup such commissions by offset or refund, at the Company's discretion.

  4.4 Commissions shall be payable in U.S. funds. Payment of the commission shall be deemed earned and payable by Representative upon Company's receipt of payment of the applicable invoice from the customer ("Commission Date"). Company will determine payment of receivables by each Customer at the end of each month during the term and shall pay commission within 15 days of the end of each month. In regards to Net Sales derived from leases, such Commissions will be paid on an incremental basis (i.e., within 15 days of when leased income is received in accordance with the lease term).

  4.5 Upon termination of this Agreement, the Company shall pay the Representative commissions, computed in the same manner as herein provided and in accordance with Section 4.4, on orders accepted by the Company prior to the termination date except as otherwise provided in this Agreement or as may be prohibited or limited by the law of the United States or the Territory.

  4.6 Any and all taxes and like charges payable by the Representative in respect of the commissions provided for in this Agreement shall be the sole and exclusive responsibility of the Representative.

  4.7 Right to Audit. The Company shall establish and maintain a reasonable accounting system that enables Representative to readily ascertain commission payments. Representative and its authorized representatives, approved by Company acting reasonably and upon execution of a mutually agreed confidentiality agreement, shall have the right to audit and examine Customer orders, invoices, and bank statements necessary to see payment remittances and other reasonably necessary documents to validate commission payments.

Such records shall be made available to Representative during normal business hours at the Company's office or place of business and subject to a three day written notice. In the event that no such location is available, then the financial records, together with the

supporting or underlying documents and records, shall be made available for audit at a time and location that is convenient for Representative.

Costs of any audits conducted under the authority of this right to audit and not addressed elsewhere will be borne by Representative unless certain exemption criteria are met. If the audit identifies errors (of any nature) by the Company which result in an underpayment to Representative in excess of ■■■■■■■■ of the total commissions earned for the time period being audited, the Company shall reimburse Representative for the total costs of the audit. If the audit discovers substantive findings related to fraud, misrepresentation, or non-performance, Representative may recoup the costs of the audit work from the Company as well as take other actions up to and including termination of this agreement. Any adjustments and/or payments that must be made as a result of any such audit or inspection of the Company's invoices and/or records shall be made within 30 days from presentation of Representative's findings to the Company.

5. Orders

5.1   Representative shall solicit sales of the Products on behalf of the Company quoting only on such prices and terms and conditions as are specified by the Company.

5.2   Representative acknowledges and agrees Company is restricted from selling to any Customer under this Agreement or otherwise unless it obtains internal corporate approvals regarding economic justification and overall legal terms and conditions. Therefore, all orders or contracts solicited by the Representative shall be subject to commercially reasonable acceptance or rejection by the Company at its main office. The Company shall not be liable to Representative or any customers for any commercially reasonable refusal to accept or fill any order or part thereof or execute any contract.

6. Trademarks

Representative agrees that any use of the Company's trademarks or trade names will be solely in connection with advertising, promotion, sale and servicing of the corresponding Products. Representative further agrees that it will not use such marks or names, nor use any other trademark or trade name now or hereafter used by the Company, as part of Representative's corporate title, business identity or trade name, nor use any similar mark or name in any manner likely to lead to confusion with the Company's trademarks or trade names or in any way deceive the public or be injurious to the Company. All use thereof, whether in advertisements, telephone directory listings, stationery or business forms, or on or about Representative's place of business or otherwise, shall at all times be subject to the Company's approval and shall be changed promptly at the reasonable request of the Company. Representative agrees

that all such trademarks and trade names are and shall remain the sole and exclusive property of the Company.

7. **Term**

Unless otherwise terminated as provided herein, this Agreement shall remain in effect for a minimum period of two years up to ten years subject to the provisions of Section 8 of this Agreement. After such date or dates, except as otherwise expressly provided herein, all rights of both parties pursuant to this Agreement shall cease. Neither party has the right, express or implied, to renew or continue this Agreement. The parties may continue the relationship set forth in this Agreement only by their execution of a new agreement or by a written amendment to this Agreement.

8. **Termination**

8.1 It is understood and agreed by Representative that this Agreement has been entered into by the Company in reliance upon the reputation and skills of Representative's existing owners, principals and operating management and that, in addition to other rights which the Company may have hereunder, the Company has the right to terminate this Agreement upon ten days' prior written notice to Representative in the event of any change, whether by sale, transfer or relinquishment, voluntary or by operation of law, of the direct or indirect ownership or control of Representative.

8.2 This Agreement may be terminated immediately by the Company or the Representative, upon the occurrence of an Event of Default by the other party as described in Section 8.4 below.

8.3 This Agreement and Representative's appointment hereunder shall terminate automatically and without further action by either party upon the occurrence of any of the following events:

(a) if the Company or the Representative shall become insolvent or shall make an assignment for the benefit of creditors or become involved in receivership, bankruptcy, or other insolvency or debtor relief proceedings, or in proceedings, voluntary or forced, whereby the Company or the Representative is limited in the free and unrestrained exercise of its own judgment as to the carrying out of the terms of this Agreement;

(b) if the Company or the Representative shall cease to do business;

(c) if the Company or the Representative shall attempt to assign any of its rights or obligations under this Agreement;

(d) if this Agreement is held invalid or unenforceable by the determination of any agency of any government or by any court of competent jurisdiction.

(e) If Company (based on Representative's efforts) has not generated Net Sales from Products greater than ▮▮▮▮▮▮▮▮▮▮ ("Sales Target") from any Customer during any consecutive two year increments during this Agreement. The Company will assess to determine if the Sales Target is achieved for the first time two years from the Effective Date and each two year anniversary thereafter.

Upon termination of this Agreement, Representative shall cease soliciting orders for Products on behalf of the Company and Representative shall have no right to commissions on orders accepted after such termination date (and related sales derived from such orders accepted after such termination date).

8.4 An Event of Default will be deemed to have occurred under this Agreement upon the happening of any of the following events or conditions:

(a) The Company or the Representative fails to pay on a timely basis the amounts due to each other hereunder, if any;

(b) The Company or the Representative fails to perform any of its other obligations hereunder, and such failure shall continue for ten (10) days after notice thereof is given to the non-performing party; or

(d) the occurrence of circumstances described in Section 9 hereof.

9. Changed Circumstances

The Company and the Representative agrees to provide immediate written notice to each other of any material adverse change in its financial condition or credit rating or of any anticipated material change in its policies, ownership, control or operating management, whether contingent or otherwise, arising during the term of this Agreement, which might affect each party's performance of this Agreement.

10. Force Majeure

Neither party shall be liable for failure to perform any of its obligations under this Agreement when such failure is caused by the occurrence of any contingency beyond the reasonable control of such party, including but not limited to, fire, flood, earthquakes, strikes, or other industrial disturbances, failure to supply raw materials, accident, war, riot, insurrection, acts of God, orders of government agencies or failure of or delay in transportation.

11. **Third Party Payments; U.S. Foreign Corrupt Practices Act; Business Conduct Guidelines**

11.1 The Company and the Representative represent that it has not and agrees that it will not in connection with the transactions contemplated by this Agreement, or in connection with any other business transactions involving either party, make any payment or transfer anything of value, directly or indirectly, (i) to any governmental official or employee (including employees of government corporations), or to any political party or candidate, (ii) to any officer, director, employee or representative of any actual or potential Customer, (iii) to any officer, director or employee of the Company or the Representative or any of their affiliates, or (iv) to any other person or entity if such payments or transfer would violate the laws of the country in which made or the laws of the United States. It is the intent of the parties that no payments or transfers of value shall be made which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business.

11.2 The Company and the Representative represents and agrees that it is familiar with the provisions of the U.S. Foreign Corrupt Practices Act (FCPA) and agrees that (i) it will not violate or cause either party to violate such Act in connection with the sale or distribution of the Products or Product services; (ii) notwithstanding any other provisions of this Agreement to the contrary, that the either party may terminate this Agreement forthwith upon learning that either party has violated or caused the other party to violate the FCPA in connection with the sale or distribution of the Products or Product services; (iii) in the event of termination for such cause, either party may retain from, or charge to, the other an amount equal to the amount to be earned by either party in respect of the transaction or matter in which the other party violated or caused the other party to violate the FCPA, and (iv) it will indemnify and hold the other party harmless from any and all damages, costs or liabilities, including attorneys' fees, directly or indirectly arising out of that party's acts or omissions which violate the FCPA or causes the party to violate the FCPA. Concurrent with the execution of this Agreement and subsequently during the term thereof as the Company or the Representative shall reasonably require, either party shall confirm in writing that neither the other party nor any agent, sub-representative, consultant, nor other person retained or paid by the other party in connection with the sale or distribution of Products has violated or caused the other party to violate the FCPA.

11.3 The Company and the Representative represents that it has disclosed to each other that no government official has any interest, direct or indirect, in either party or in the contractual relationship established by this Agreement. In the event that during the term of this Agreement there is acquisition of any such interest in either party or in this Agreement by a government official, such party agrees to make immediate written disclosure to the other party, and this Agreement will become subject to termination. For the purposes of this paragraph, "government official" means

any officer or employee of the government or any department, agency, corporation or instrumentality thereof.

12. Notices and Payments

All notices, consents, approvals or other notifications required of the parties under this Agreement shall be in writing and shall be deemed properly served if delivered personally or sent by registered or certified mail (return receipt requested), facsimile or courier service addressed to such other party at the address set forth above or at such other address as may hereafter be designated by either party in writing, and shall be deemed delivered ten (10) business days after being sent by mail or one business day after being sent by facsimile or when actually delivered if sent by courier service.

13. Confidential Information

Confidential Information shall include, and shall be deemed to include, all information conveyed by either party to the other orally, in writing, by demonstration, or by other media. Confidential Information shall be considered as such at the time of transmittal. Confidential Information may include, by way of example but without limitation data, know-how, contacts, contracts, software, formulas, processes, designs, sketches, photographs, plans, drawings, specifications, samples, reports, and information relating to transactional procedures. However, Confidential Information shall not include information, which can clearly be demonstrated to be (i) generally known or available to the public, through no act or omission on the part of the receiving party; or (ii) provided to the receiving party by a third party without any restriction on disclosure and without breach of any obligation of confidentiality to a party to this Agreement; or independently developed by the receiving party without use of the Confidential Information.

The parties agree that when receipt of any Confidential Information has occurred:

a. The receiving party shall not disclose or communicate Confidential Information to any third party, except as herein provided. The receiving party shall protect such information from disclosure by reasonable means, including but not limited to at least the same minimal level of security that the receiving party uses for its most crucial proprietary and trade secret information.

b. The receiving party shall reasonably protect the Confidential Information with not less than the same degree of care exercised by its own personnel to protect its own, or publication of its own, most valuable confidential and proprietary information.

    c.    A party shall permit access to its Confidential Information to the such party's agents or employees or third parties only if such disclosure is reasonably believed to be necessary to the purposes of that party evaluating, contemplating, recommending, or engaging the supply of products, goods, materials or services for the System, or for the purpose of entering into a business relationship with that party, and only if said agents, employees, or third parties:

        i.    reasonably require access to the Confidential Information for purposes approved by this Agreement, and

        ii.    have been apprised of this Agreement and that party's obligations to maintain the trade secret status of Confidential Information and to restrict its use as provided by this Agreement.

The non-competition provisions of this Agreement are an essential and material part of the total agreement, by which either party agrees it shall not use any advantages derivable from Confidential Information in its own business or affairs, unless the same is done pursuant to a new agreement executed by all signatories to this document.

14.    <u>Indemnification</u>

    a.    Representative's Indemnity. Representative shall indemnify the Company and its Indemnitees against all claims, liability, and expenses (including reasonable legal fees) arising from any third party claim or proceeding brought against the Company where negligent act or omission or willful conduct of Representative or its Indemnitees is proven.

    b.    Company's Indemnity. The Company shall indemnify the Representative and its Indemnitees against all claims, liability, and expenses (including reasonable legal fees) arising from any third party claim or proceeding brought against the Representative where negligent act or omission or willful conduct of the Company or its Indemnitees or any defects in the Products caused by the Company is proven.

    c.    Conditions for Indemnification. A party's obligation to indemnify the other party under this section is conditional upon the indemnified party giving the indemnifying party prompt written notice of a claim or potential claim made against it, giving the indemnifying party sole control of the defense and settlement of the claim, except that the indemnifying party may not settle the claim unless the settlement unconditionally releases the indemnified party of all liability, and providing the indemnifying party with all reasonable assistance, at the indemnifying party's expense, in connection with the claim.

d. Exception. No party will be entitled to indemnification from the other party if the claim is based on or results in any material part from the negligence or unlawful or wrongful acts of the party seeking indemnification.

e. Exclusive Remedies. The indemnification rights granted under this section are the exclusive remedies available under this agreement in connection with the claims and losses that this section addresses.

f. Definition of "Indemnitee." In this agreement, "Indemnitee" means, for either party, any of that party's directors, officers, employees, shareholders, partners, agents, or affiliates.

15. Miscellaneous

15.1 This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their successors and assigns. Neither this Agreement nor any rights granted hereunder may be assigned in whole or in part by either party without the express written consent of the other party, except that this Agreement may be assigned by a party to any corporation that is controlling, controlled by, or under common control with such party, or to any successor to the business of such party to which this Agreement primarily pertains.

15.2 This Agreement constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement and supersedes and replaces any and all agreements relating to the subject matter hereof between the parties. This Agreement cannot be modified or amended except by an instrument in writing of subsequent date hereto duly executed by each of the parties.

15.3 The failure of either party hereto to enforce at any time any of the provisions, rights or obligations of this Agreement shall not be considered a waiver of such provisions, rights or obligations.

15.4 All headings or captions used in this Agreement are utilized for convenience of reference only and shall not be construed to interpret the provisions to which they refer.

15.5 The rights and remedies available to a party under this agreement are cumulative and in addition to, not exclusive of or in substitution for, any rights or remedies otherwise available to that party.

15.6 Sections 4, 13, and 14 survive the termination or expiration of this agreement.

15.7    If any part of this agreement is declared unenforceable or invalid, the remainder will continue to be valid and enforceable.

15.8    Except as otherwise expressly provided herein, in the event of any litigation brought to enforce any material provision of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and court costs, including interest as may be provided by law, from the other party.

15.9    The parties acknowledge that a breach or threatened breach of any their obligations under section 13 would not be susceptible to adequate relief by way of monetary damages only. Accordingly, either party may, in that case, apply to court for any applicable equitable remedies (including injunctive relief), without the need to post any security.

15.10    This agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws rules.  In the event of any dispute between the parties hereto concerning or relating to this agreement, upon request of either party, the parties agree to submit the dispute to binding arbitration in the State of Delaware, in accordance with the rules of the American Arbitration Association.

15.11   Each party irrevocably waives its rights to trial by jury in any action or proceeding arising out of or relating to this agreement or the transactions relating to its subject matter.

15.12   This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. The parties hereto agree that this Agreement may be transmitted between them by facsimile or electronic mail and, upon evidence of receipt of same, shall constitute delivery of this Agreement. The parties intend that faxed or electronic signatures constitute original signatures and that an Agreement containing the signatures (original, facsimile or electronic) of all the parties is binding on the parties once sent via facsimile or via electronic mail or delivered to the other party.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the day and year first above written.

Scholle IPN Packaging, Inc.

By: ███████████████████



Zephyr Fluid Solutions, LLC

By: _____  Date: 11/5/2018 [INSERT DATE]
(signature)

Name: Larry Cennamo
Title: CFO

Case 1:22-cv-00475-SRF    Document 13    Filed 06/08/22    Page 18 of 18 PageID #: 131